# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| **FORD PERINE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case number 4:07cv1212 HEA** |
| | ) **TCM** |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue, the Commissioner of Social Security ("Commissioner"), denying Ford Perine supplemental security income benefits ("SSI") under Title XVI of Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383b. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Ford Perine ("Plaintiff") applied for SSI in October 2001, alleging a disability as of February 1992[1] caused by back pain and hepatitis C. (R.[2] at 61-64.) This application was

---

[1] Plaintiff had applied in February 1992 for SSI, but had not pursued the case after an initial denial. (See R. at 14.)

[2] References to "R." are to the administrative record filed by the Commissioner.

denied initially and after a hearing held in May 2003 before Administrative Law Judge ("ALJ") Robert O'Blennis.  (Id. at 14-22, 32-38, 333-68.)  The ALJ found that, although Plaintiff had severe impairments of herniated nucleus pulposus, hepatitis C, alcohol and polysubstance dependence, antisocial personality disorder, and borderline intellectual functioning, he did not have an impairment or combination thereof of listing-level severity. (Id. at 21.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 5-7.)

Plaintiff then filed a 42 U.S.C. § 405(g) action.  Perine v. Social Security Admin., 4:04cv1052 TIA.  On motion of the Commissioner, the case was remanded to the Appeals Council to have the ALJ conduct a supplemental hearing, obtain a mental status consultative examination with psychological testing, and elicit evidence from a mental health medical expert on whether Plaintiff's impairments meet or equal Listing 12.05C (mental retardation) or another listing.  Id. (Mem. of August 10, 2005, at 2.)  The court noted that the ALJ's conclusion that Plaintiff had no deficits in adaptive functioning since before the age of 22 was inexplicably inconsistent with Plaintiff's IQ scores.  (Id. at 3.)

Subsequently, a hearing was held before ALJ Thomas C. Muldoon in February 2007. (Id. at 505-22.)  Judge Muldoon also decided that Plaintiff did not have an impairment or combination thereof of listing-level severity and denied his application.  (Id. at 372-79.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the second administrative hearing.

Plaintiff testified that he was born on July 30, 1959, and was then 47 years old.  (<u>Id.</u> at 508.)  He is 5 feet 11 inches tall and weighs approximately 243 pounds.  (<u>Id.</u>)  He has lived in an apartment owned by his mother since 1997.  (<u>Id.</u>)  Other than food stamps, he has no income.  (<u>Id.</u> at 509.)  His mother and step-daughter support him.  (<u>Id.</u>)

He cannot recall how far he went in school.  (<u>Id.</u>)  He never graduated from high school and never got a General Equivalency Degree ("GED").  (<u>Id.</u>)  He cannot read or write; he can recognize his name.  (<u>Id.</u>)  He has taken the driver's license test several times, but has always failed.  (<u>Id.</u> at 513.)  He depends on public transportation or his brother to get around.  (<u>Id.</u>)  He has never received any vocational training, and has never been in the military.  (<u>Id.</u> at 510.)

His last job was processing cow hide at Herman Oaks Leather Company.  (<u>Id.</u>)  He worked there for approximately six months, until he injured his back.  (<u>Id.</u>)  The job required that he lift cow hides, weighing from 20 to 75 pounds.  (<u>Id.</u> at 511.)  Before that, he worked at a fertilizer company.  (<u>Id.</u>)  This job required that he lift 55-pound bags of fertilizer.  (<u>Id.</u>)  He held this job for one or two months.  (<u>Id.</u>)  He worked for three months washing dishes at a hotel, Viking Restaurant and Lodge.[3]  (<u>Id.</u>)  This job ended because of transportation problems.  (<u>Id.</u> at 511-12.)  Transportation problems also ended his dishwashing job at another restaurant.  (<u>Id.</u> at 512.)

Asked why he cannot work, Plaintiff replied that his back and lack of education are the cause.  (<u>Id.</u> at 513.)  The problems with his back are a degenerated disc, arthritis, and

---

[3]He worked at the Viking Restaurant in 1989.

pinched nerve. (Id.) His back pain is sometimes constant and sometimes sporadic. (Id.) Twisting and bending can cause the pain. (Id. at 514.) Standing for longer than ten to fifteen minutes also causes back pain. (Id.) He then has to sit down; however, sitting for longer than fifteen to thirty minutes causes lower back pain. (Id. at 514-15.) To relieve this pain, he has to lie down in a fetal position. (Id. at 515.) The farthest he walks is approximately one block, and even then he has to take his time. (Id. at 516.) Walking up and down stairs causes him back pain and breathing problems. (Id.) He uses an inhaler for his emphysema. (Id.)

He received treatment for his back until the doctor recommended surgery. (Id. at 515.) The doctor said it might take two or three surgeries. (Id.) Plaintiff was concerned that the surgeries would cripple him and refused. (Id.)

Plaintiff can lift, perhaps, fifteen to twenty pounds. (Id. at 516.)

Plaintiff has numbness and tingling in his feet every day. (Id. at 516-17.)

Asked to describe a typical day, Plaintiff testified that he gets up at approximately 4:00 in the morning and goes to bed at approximately 10:00 at night. (Id. at 517.) He sporadically wakes up during the night. (Id.) He has no energy, and does not try to do anything. (Id.) He used to play football and baseball, and now does neither. (Id.) His step-daughter does the grocery shopping for him; she and his brother do his cooking. (Id.) He uses paper dishes. (Id.) His brother does his household chores for him, although he straightens his bed sheets. (Id. at 518.) His nephews do his yard work; someone else does his laundry. (Id.) He has problems putting on his shoes. (Id.) He watches television during

the day.  (Id. at 519.)  His friendships ended when he was doing drugs and drinking.  (Id.)
He stopped doing both in 2000.  (Id. at 520.)  He tries to go to church on Sundays and
Thursdays.  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part
of the application process, documents generated pursuant to his application, school records,
records from various health care providers, and reports from consultants.

When applying for SSI, Plaintiff completed a Disability Report.  (Id. at 77-86.)  He
listed hepatitis C as the illness that limited his ability to work and a back injury that limited
his ability to lift more than twenty pounds.  (Id. at 78.)  These impairments first bothered him
in October 2001[4] and prevented him from working as of April 2001. (Id. at 78.)  He returned
to work after his impairments first bothered him, working less hours and on light duty.  (Id.)
He had to stop working in August 2001 because his employer would not accommodate his
doctor's lifting restriction.  (Id.)  He completed the fifth grade and had no special job training.
(Id. at 84.)  On a Work History Report, Plaintiff listed eight jobs, three of which he described
as laborer.  (Id. at 91-98.)  The only job that he had held longer than seven months was the
job working for Hermann Oak Leather Company.  (Id. at 91.)

Plaintiff reported on a Pain Questionnaire that he had constant pain in his back,
stomach, legs, feet, and left hand.  (Id. at 100.)  The pain was sharp, throbbing, and dull.

---

[4]The year was clearly an error.  Medical records and other application documents list the year
as "2000."

(Id.)  It was caused by walking, standing, and sitting for too long.  (Id.)  It was relieved by laying down.  (Id.)  He did not take any medication because he had no money.  (Id.)  In a Claimant Questionnaire, he reported that he had back pain and aches in his feet and hands. (Id. at 101.)  These were caused by squatting, bending, walking, or lifting.  (Id.)  They were relieved by lying down.  (Id.)  He needs help reading labels and pushing a cart when he shops.  (Id. at 102.)  Friends help him do chores and prepare meals.  (Id.)  During the day, he watches television and listens to the radio.  (Id. at 103.)  He does not keep a checkbook; friends help him complete money orders.  (Id.)  He goes to church every Sunday.  (Id. at 104.)

Plaintiff's school records indicate that he was promoted to the ninth grade in June 1975.  (Id. at 125-26.)  They do not indicate that he enrolled or again attended school  (Id.) They do list IQ scores of 78 and 73 in November 1971.[5]  (Id. at 126.)

On a form requesting information about why he returned to work after his alleged disability onset date, Plaintiff replied that he injured himself at work on October 13, 2000, and was put on light duty.  (Id. at 70-75.)  Even so, he was unable to work a forty-hour week. (Id. at 71.)  He reinjured his back in April 2001 and was returned to light duty.  (Id.)  He had to stop working entirely in July 2001.  (Id. at 72.)

In February 2006, Plaintiff listed his medications as Aleve, Advil, and Motrin 800. (Id. at 417.)  Each was taken for back pain.  (Id.)

---

[5]The test resulting in the 78 score is designated as "LTNV"; the other test is designated as "LTV."  (Id. at 126.)  As noted by Plaintiff, the initials probably refer to the Lorge-Thorndike Intelligence Tests, Verbal or NonVerbal, used to measure intelligence in school-age children.

In December 2006, Plaintiff reported that he had seen Dr. Wanda Trotter, at St. Louis ConnectCare for treatment of a "swollen heart" and emphysema. (Id. at 422.) On an undated form, he reported that Dr. Trotter had prescribed Combivent for his heart and emphysema. (Id. at 424.) It was to be taken as needed. (Id.)

Plaintiff's earnings record reflects reported income for the years from 1975-1978, 1986 to 1989, 1991, 1996-2001. (Id. at 65-68, 406.) In 1999, 2000, and 2001, he worked for Hermann Oak Leather Company. (Id. at 68.) His annual income exceeded $5,000 in four of the fifteen years in which he had earnings. (Id. at 406.) Specifically, he earned $8,492.64 in 1986; $5,115.49 in 1999; $21,617.84 in 2000; and $11,110.43 in 2001. (Id.)

The medical records before the ALJ begin in 1998.

Plaintiff tested positive for hepatitis C in September 1998. (Id. at 133.) He reported to his physician, Stephen Storfer, M.D., that he had been having episodes of light-headedness and vertigo for the past month. (Id. at 132.) He was single, lived alone, and was totally disabled since injuring his back in a motor vehicle accident in 1987. (Id.) He had had no other major illnesses. (Id.) He drink beer and had, until the month before, drank a pint of hard liquor every day. (Id.) He was advised to stop drinking and of the risks of drinking with hepatitis. (Id. at 131.) He had had headaches for years, but had no shortness of breath or cough. (Id. at 130.) He had chronic low back pain made worse by sitting. (Id.) His mood was good. (Id.) He had a history of depression a few years before caused by relationship problems. (Id.) An echocardiogram showed mild pulmonic regurgitation and trivial tricuspid regurgitation. (Id. at 150.)

Plaintiff did not keep his next few appointments with Dr. Storfer, but did return in March 1999, explaining that he had had transportation problems.  (Id. at 138-39.)  His episodes of lightheadedness and vertigo were better.  (Id. at 138.)  He thought the episodes and the twice-weekly headaches might be related to stress.  (Id.)  He was continuing to drink.  (Id.)  He was eating well because his girlfriend was cooking for him.  (Id.)  He was encouraged to stop drinking.  (Id. at 139.)  Two months later, Plaintiff returned for a follow-up appointment.  (Id. at 144.)  He had pain in his lower back and legs.  (Id.)  He had been gaining weight.  (Id.)  He was walking twice a week for forty-five minutes.  (Id.)  His headaches were better on the medication prescribed at the last visit.  (Id.)  Dr. Storfer discussed interferon treatment for the hepatitis and its possible side effects.  (Id.)  Plaintiff was to review some literature and return to view a videotape.  (Id.)

Plaintiff was not at home when the van came to pick him up for his June visit.  (Id. at 145.)  He returned in August to review the literature for interferon therapy.  (Id.)  He was ready to begin.  (Id.)  He had not had any other episodes of lightheadedness.  (Id.)

Plaintiff injured his left shoulder in October 2000 when pulling on leather.  (Id. at 233.)  X-rays revealed degenerative changes at the acromioclavicular joint in both shoulders and in his spine at L5.  (Id. at 233, 235.)  Eight days later, after visiting a physician at BJ Corporate Health, he was released to return to work with a restriction not to lift anything heavier than twenty pounds.  (Id. at 234.)  He was also to limit repetitive bending and twisting of his back.  (Id. at 235.)  He was prescribed a non-steroidal, anti-inflammatory, and was scheduled for physical therapy.  (Id. at 234-35.)  After another doctor's visit on October

16, the lifting limit was increased to thirty pounds. (Id. at 239.) Plaintiff participated in physical therapy on October 18, October 20, October 23, October 25, and October 27. (Id. at 237-38, 241-46, 249-51.) Also on October 27, Plaintiff was seen again by the doctor. (Id. at 247-48.) His lifting restrictions were unchanged, and he was prescribed Celebrex, another non-steroidal, anti-inflammatory drug. (Id. at 248.) Plaintiff participated again in physical therapy on October 30 and November 1. (Id. at 252-56.) His last visit to the doctor was on November 2. (Id. at 257-61.) On examination, he had no lumbar pain or decreased range of motion. (Id. at 258.) His deep tendon reflexes of his lower extremities were present and equal bilaterally. (Id. at 258-59.) His straight leg raising was normal, and he was able to walk heel to toe. (Id. at 259.) He was released to return to full duty at work and was to continue with a home exercise program. (Id. at 257, 260-61.) The diagnosis was improving lumbar strain. (Id.)

Plaintiff returned to the doctor, however, on November 27, explaining that he had pain in his right hip and back. (Id. at 262-66, 268-69.) He had gone to the St. Louis University emergency room on November 19 for back pain that radiated down his right leg. (Id. at 263, 268, 287-95.) He had been doing his usual work duties, but had not been doing his home exercise program. (Id. at 263, 268.) He could not recall any incident or trauma that could have aggravated his pain. (Id.) His range of motion was reduced to 50% on flexion, extension, sidebending, and rotation. (Id.) He had a full range of motion in his cervical spine, but with "intense pain." (Id.) He was advised to continue with his home exercises and was to apply warm compresses to his lower back three times a day for ten to fifteen minutes.

(Id. at 264.) His lifting was limited to ten pounds, and he was to sit down as often as possible. (Id. at 262, 265-66.) Plaintiff was referred to an orthopedic specialist. (Id.)

Consequently, Plaintiff was referred to Barry Samson, M.D., for an orthopedic evaluation. (Id. at 267.) Plaintiff was seen by Dr. Samson with the St. Louis Spine Care Alliance on November 29. (Id. at 270-76.) He reported having injured his back on October 13 when at work. (Id. at 274.) Following his return to full duty, his pain markedly increased. (Id.) He was back on light duty. (Id.) On examination, his gait was normal, he had no limp, and he could tiptoe and walk on his heels. (Id. at 275.) He complained of right lower back pain at 60 degrees flexion. (Id.) His hip motion was not restricted or painful. (Id.) His quadriceps and toe strength were normal, and his reflexes were symmetrical at the knees and ankles. (Id.) He had low back pain on straight leg raising on his right. (Id.) He could lift fifteen pounds and had no restrictions on his ability to stand, sit, or walk, but restricted to occasionally squatting, bending, kneeling, pushing, pulling, or climbing. (Id. at 276.) The diagnosis was right sciatica. (Id. at 271, 275.) Plaintiff was prescribed a Medrol dosepak and scheduled for a lumbar magnetic resonance imaging ("MRI"). (Id. at 273, 275.) He could return to work, on light duty. (Id. at 275.) The MRI showed degenerative disc disease at L4-L5 and L5-S1. (Id. at 283-85.) It also showed "decreased signal intensity at L4-5 and L5-S1 with posterior disc protrusion at both levels." (Id. at 283.) The disc protrusion at L5-S1 was predominantly on the right. (Id.)

Plaintiff reported three days later that the medication was not helping. (Id. at 278.) His gait was normal, as were the reflexes in his knees and ankles. (Id.) Strength was normal.

(Id.) Straight leg raising was negative. (Id.) Plaintiff could return to work with restrictions of lifting no more than fifteen to twenty pounds and of the same exertional limitations as before. (Id.) The diagnosis was right sciatica with degenerative disc disease at L4-L5 and L5-S1. (Id.) On a return visit on December 27, he walked with a limp, favoring his right leg and taking small steps. (Id. at 279-81.) Bending caused him increased pain in his low back. (Id. at 279.) Straight leg raises on his right caused him low back pain, but not leg pain. (Id.) Reflexes were normal and symmetrical; toe strength was normal. (Id.) Dr. Samson recommended a right selective root injection. (Id.) Plaintiff could return to work restricted to light duty, with "very rare" squatting, bending, and kneeling, and occasionally pushing, pulling, climbing, and reaching. (Id.) His lifting restriction was as before. (Id.) He was prescribed Vioxx and Ultram. (Id. at 281.)

Pursuant to his worker's compensation claim, Plaintiff was evaluated by Andrew M. Wayne, M.D., in January 2001 for his complaints of low back pain. (Id. at 297-98.) On examination, he had tenderness in the right lumbar paraspinals at approximately L4. (Id. at 298.) Straight leg raises caused right buttock pain, but no pain on the left. (Id.) His range of motion in his lumbar spine was 50% of normal for forward flexion. (Id.) His range was normal for extension. (Id.) He had pain in his right lower back with right sidebending. (Id.) He could heel to toe walk normally. (Id.) Dr. Wayne suggested a trigger point injection; Plaintiff agreed. (Id.) He was to start physical therapy. (Id.) Plaintiff could return to work on light duty, with a lifting limit of twenty-five pounds, and with no frequent twisting and

bending of his lower back.  (Id.)  Dr. Wayne also suggested a lumbar epidural injection if Plaintiff did not significantly improve.  (Id.)

A few weeks later, Plaintiff returned to Dr. Wayne.  (Id. at 299.)  He reported that he had been doing well since the injection and physical therapy until three days earlier when his symptoms worsened.  (Id.)  He was encouraged to continue physical therapy and his home exercise program.  (Id.)  He was also to continue on light duty at work.  (Id.)  On February 5, he reported doing reasonably well.  (Id. at 300.)  On examination, his lumbar spinal range of motion on flexion had increased to 65 to 70% of normal.  (Id.)  Extension and sidebending were normal, as was his gait.  (Id.)  He was able to heel-to-toe walk.  (Id.)  Plaintiff was encouraged to increase his activities to full duty.  (Id.)  It was anticipated that Plaintiff would achieve maximum medical improvement in two to three weeks.  (Id.)

Plaintiff saw Dr. Wayne again on March 2.  (Id. at 301.)  Between visits, he had undergone a functional capacity evaluation.  (Id.)  The results showed that Plaintiff was functioning in the medium to heavy demand level.  (Id.)  The evidence showed submaximal effort on the evaluation, although he was also described as giving fair effort.  (Id.)  He perceived his degree of dysfunction to be 60% – a severe level.  (Id.)  On examination, Plaintiff's condition was unchanged since his last visit.  (Id.)  His gait was normal, as was his straight leg raising.  (Id.)  Dr. Wayne was puzzled why Plaintiff continued to have the same amount of subjective pain after having appropriate, conservative treatment.  (Id.)  There was no evidence of any nerve compromise or structural instability.  (Id.)  He had some chronic degenerative changes, as revealed on the earlier MRI, but no acute abnormalities.  (Id.)  He

was to continue his home exercise program and could take Celebrex as needed.  (Id.)  he could also return to regular work duty without restrictions.  (Id.)  Dr. Wayne opined that Plaintiff had a 2% permanent disability of the person as a whole.  (Id.)

After injuring his back on April 27 when he slipped and fell at work, Plaintiff went to the emergency room at St. Louis University Hospital.  He was again referred to Dr. Samson.  (Id. at 158-59.)  On examination, Plaintiff walked with a guarded gait.  (Id. at 160.)  He could get up on his toes and heels at 30 degrees flexion.  (Id.)  He complained of right lower back pain and pain in the right groin on forwarded bending.  (Id.)  Straight leg raising on his right caused right low back pain and groin pain.  (Id.)  His reflexes were symmetrical; his toe strength and quadriceps strength were normal.  (Id.)  The diagnosis was right sciatica. (Id. at 161.)  He could return to work with a restriction to light duty, i.e., lifting no more than five pounds and occasional pushing, pulling, and climbing.  (Id.)  A lumbar myleogram and computed tomography ("CT") scan were to be scheduled.  (Id.)

The CT scan showed degenerative disc disease at L5-S1 and L4-L5; diffuse bulging at L4-L5 with significant disc degeneration; and a right paramedian disc herniation and protrusion at L5-S1.  (Id. at 162, 182-83.)  The lumbar myleogram spine showed degenerative disc disease and mild spondylotic change at the L4-L5 and L5-S1 levels.  (Id. at 179, 302-25.)  The lumbar myelogram also showed the degenerative disc disease.  (Id. at 180.)  The findings suggested a diffuse disc bulge at L4-L5 and right posterolateral disc herniation at L5-S1.  (Id. at 181.)  Dr. Samson opined that surgery would be a major undertaking due to the degeneration.  (Id.)  He recommended an epidural cortisone injection

at L4-L5 and prescribed Darvocet every four hours as needed for pain. (<u>Id.</u>) Plaintiff was to remain off work. (<u>Id.</u>)

Anthony H. Guarino, M.D., gave Plaintiff an epidural steroid injection in June. (<u>Id.</u> at 163-65, 326-27.) On examination, Plaintiff walked with a normal gait and was able to heel walk, toe walk, and squat without assistance. (<u>Id.</u> at 164.) He had normal muscle tone. (<u>Id.</u>) The impression was of lumbosacral radiculopathy. (<u>Id.</u>)

He reported to Dr. Samson the next week that he had noticed significant improvement since the injection. (<u>Id.</u> at 166.) He had no right leg pain, but did have, for the first time that morning, some left leg discomfort. (<u>Id.</u>) He had a limp. (<u>Id.</u>) Straight leg raising on the right caused back pain, but no leg pain. (<u>Id.</u>) Straight leg raising on the left was negative. (<u>Id.</u>) Motor strength was normal. (<u>Id.</u>) The diagnosis was degenerative disc disease and sciatica, "improving." (<u>Id.</u>) Plaintiff was released to return to work with a ten-pound lifting restriction and occasional bending, pushing, pulling, and climbing until June 28, at which time he could return to normal duties. (<u>Id.</u>)

Dr. Guarino gave Plaintiff a second injection on June 28. (<u>Id.</u> at 167, 329.) On July 11, he returned to Dr. Samson with complaints of increased pain in his back and of his feet "feeling warm." (<u>Id.</u> at 168.) His right leg was numb at times. He had returned to regular duties the previous Monday but was unable to continue due to increased pain. (<u>Id.</u>) Dr. Samson added Ibuprofen to his medication and told him to remain off work that week. (<u>Id.</u>) Plaintiff was to return to work on July 16 with the previous restrictions. (<u>Id.</u>) Plaintiff returned to Dr. Samson on July 18, reporting that he had not been permitted to continue to

work on light duty and had been sent home. (Id. at 169.) He needed to work because he had no other income. (Id.) On examination, his gait was stiff; straight leg raising on the left caused back pain; and 60 degrees of flexion caused low back pain. (Id.) Dr. Samson told Plaintiff he could try returning to work the following day or could get a second opinion. (Id.)

Plaintiff got a second opinion. A Dr. Lang opined that Plaintiff could either have surgery or undergo a functional capacity evaluation. (Id. at 170.) Dr. Samson discussed these options with Plaintiff, who elected not to have surgery but did want to have the evaluation. (Id.)

Plaintiff underwent another functional capacity evaluation on August 7. (Id. at 171-76.) On examination, he had 50% trunk flexion, extension, and sidebending to the right. (Id. at 173.) Sidebending to the left was 75%, (Id.) Rotation to the right was within normal limits, with pain at the end of the range, and to the left was 50% with increased pain. (Id.) He tended to flex forward when rotating to the left. (Id.) Straight leg raising was 20 degrees of hip flexion on the right and 40 degrees on the left. (Id.) The maximum weight he could carry was fifteen pounds, he could push was sixty-one pounds, he could left from floor to waist was twenty pounds, and he could lift from waist to overhead was fifteen pounds. (Id.) He was able to climb fifteen steps, but had to use a step to step pattern with decreased weight bearing on his right. (Id. at 174.) He was able to walk 375 feet "with an extremely slow pace." (Id.) Right hip pain caused him to stop and sit down. (Id.) Dr. Samson advised Plaintiff that the lifting restrictions were permanent and opined that he had achieved

maximum medical improvement. (Id. at 177.) In a separate letter, Dr. Samson opined that Plaintiff had a 10% permanent partial disability at the lower lumbar spine. (Id. at 178.)

Plaintiff consulted Dr. Wanda Trotter with St. Louis ConnectCare ("SLCC") on January 4, 2002. (Id. at 195-208.) He reported that his back pain increased after walking, sitting for longer than fifteen to thirty minutes, and standing for longer than fifteen to thirty minutes. (Id. at 198.) An x-ray of his lumbar spine showed minimal degenerative changes. (Id. at 209.) On February 20, Plaintiff reported that he felt okay, but his back pain was unchanged. (Id. at 193.) His diagnosis was low back pain, chronic alcoholism, hepatitis C, and a history of drug abuse. (Id.) He denied any chest pain or palpitations. (Id.) His lungs were clear. (Id. at 194.) His medications were renewed and he was to return in three months. (Id.)

Plaintiff did return, in December 2002. (Id. at 223-24.) He continued to have back pain caused by walking or sitting. (Id. at 223.) Dr. Trotter prescribed Motrin and another medication (the name is illegible) and instructed Plaintiff to return in six months. (Id. at 224.) Plaintiff returned in March with complaints of low back pain and tingling in his toes. (Id. at 225-27.) The pain increased with coughing or sneezing. (Id. at 225.) The diagnosis was parasthesia of the lower extremities. (Id. at 226.) He was to be scheduled for a CT scan. (Id. at 227.) In May, Plaintiff had tenderness over his lumbar spine. (Id. at 228.)

Plaintiff returned to SLCC on July 24, 2003, with complaints of low back pain. (Id. at 435-39.) His gait was antalgic, and he had decreased back motion. (Id. at 439.) His left knee was swollen. (Id.) He had a lumbar spasm on his right. (Id.) He had flexion to twenty

degrees, extension to ten degrees, and straight leg raising to twenty degrees bilaterally. (Id.) The doctor, Eli R. Shuler, M.D., opined that Plaintiff "probably had bilateral lumbar nerve root compression." (Id.) An MRI was to be scheduled, after which Plaintiff was to return. (Id.) Dr. Shuler suggested Plaintiff try Naproxen and participate in physical therapy. (Id.)

In August 2005, Plaintiff sought medical care for a cyst on the back of his neck. (Id. at 440-47.) It had been increasing in size, had ruptured on July 31, and had become infected. (Id. at 441, 445.) The cyst was drained. (Id.)

In October, Plaintiff sought medical care for an insect bite on his right leg. (Id. at 448-56; 498-504; <u>see</u> p. 20, below.) The bite was drained, antibiotics were given, and Plaintiff was instructed to change the dressing daily. (Id. at 450-51.)

In March 2006, Plaintiff returned to SLCC for treatment of a hard knot on his left leg. (Id. at 468-72.) The diagnosis was cellulitis; the treatment was warm compresses. (Id. at 471-72.) He returned in June with complaints of headaches for the past one to two months. (Id. at 473-79.) A head CT scan was negative. (Id. at 473.) He was to limit his caffeine intake. (Id. at 479.)

In October, Plaintiff went to the emergency room at St. Louis University Hospital with complaints of chest pain which had gradually begun two months before and was better when he took deep breaths. (Id. at 481-97.) A chest x-ray was negative. (Id. at 496.) He was discharged with instructions to use a Combivent inhaler four times a day. (Id. at 488, 490, 492.) He could take Tylenol as needed for fever. (Id.)

The ALJ also had before him the reports of consultants, both non-examining and examining.

A Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff completed was completed by Anver Tayob, M.D., an orthopedist in November 2001. (Id. at 184-91.) Plaintiff's primary diagnosis was listed as herniated nucleus pulposus and his secondary diagnosis as hepatitis C. (Id. at 184.) His impairments resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, or walk about six hours in an eight-hour workday. (Id. at 185.) He had an unlimited ability to push or pull. (Id.) He had postural limitations in avoiding frequent climbing, balancing, and kneeling and in occasionally avoiding stooping, crouching, and crawling. (Id. at 186.) He had no manipulative, visual, communicative, or environmental limitations. (Id. at 187-88.)

In January 2003, Plaintiff underwent a psychological evaluation by L. Lynn Mades, Ph.D., a clinical psychologist. (Id. at 210-21.) He complained of hearing problems in his left ear and pain in his arm and back. (Id. at 210.) He described auditory hallucinations; specifically, a man telling him to fight. (Id.) Other symptoms of a psychiatric illness were denied. (Id.) Before he stopped drinking, two years earlier, he drank a case of beer and a quart of hard liquor daily for twenty-seven years. (Id. at 210-11.) He had also used crack cocaine, pills, marijuana, and phencyclidine ("PCP"). (Id. at 211.) This drug abuse had stopped two years earlier. (Id.) His medical history was also significant for back problems, hearing loss, and hepatitis C. (Id.)

Plaintiff reported that he had attended school through the fourth grade. (Id.) He was not in special education, but had been expelled two or three times for behavior problems. (Id.) On examination, his posture and gait were within normal limits. (Id. at 212.) His speech was normal in rate, rhythm, and content. (Id.) He was oriented in all spheres, and his memory for recent and remote events appeared to be within normal limits. (Id.) His insight and judgment appeared to be "slightly limited." (Id.) On testing, he had a verbal IQ score on the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III") of 67, a performance score of 73, and a full scale score of 67. (Id. at 213, 218.) The difference between the performance score and the verbal score was considered not to be statistically significant. (Id. at 213.) Dr. Mades noted that Plaintiff had a tendency in testing to give up quickly and needed prodding. (Id.) He got some harder items correct and missed some easier ones. (Id.) "This may indicate inconsistent effort." (Id.) The results were "considered to be a valid estimate of his current level of cognitive functioning." (Id. ) "They may, however, not reflect his full potential due to the above noted factors." (Id.) The results placed him in the borderline to mildly mentally retarded range of cognitive functioning. (Id.) Plaintiff was also given the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). (Id. at 213, 216.) "He produced an invalid profile." (Id. at 213.) The validity scales indicated "a conspicuous effort to exaggerate psychological difficulty." (Id.) Dr. Mates noted that such profiles were consistent with malingering. (Id.) Plaintiff also reported that he did not like being around people and was easily irritated. (Id.) The diagnosis was alcohol and polysubstance dependence, antisocial personality disorder, and borderline intellectual

functioning.  (Id. at 214.)  His Global Assessment of Functioning score was 75.[6]  (Id.)  She questioned whether Plaintiff had maintained sobriety two years.  (Id. at 215.)  She also noted that he had shown no evidence of mood or thought disturbance and no evidence of a psychological impairment that would limit him from being employed.  (Id.)

Completing a Medical Source Statement ("MSS"), Dr. Mades opined that Plaintiff's mental impairments did not affect his ability to understand, remember, and carry out instructions.  (Id. at 220.)  They also did not affect his abilities to respond appropriately to supervisors, co-workers, and work pressures in a work setting was not affected by his borderline intellectual functioning.  (Id. at 221.)

In October 2005, Plaintiff underwent a consultative psychological evaluation by Sharon D. West, Ph.D.  (Id. at 426-33.)  His chief complaint was that he was unable to work due to hepatitis C and back pain.  (Id. at 426.)  He was "an adequate historian" and related that his childhood included group home/residential placements and juvenile detention.  (Id.)  He went only to the fifth grade in school and never earned his GED.  (Id.)  He had never been married, had no children, and lived with his mother.  (Id.)  He had spent 55 days in jail – he could not recall the charge – and had spent one year on probation for leaving the scene

---

[6]"According to the [Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF of 75 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  Diagnostic Manual at 34.

of an accident. (Id.) His probation officer sent him to inpatient treatment for alcoholism. (Id. at 426-27.) He had a fifteen-year history of polysubstance abuse, and had been sober for the past five years. (Id. at 427.) He also had a history of drug-induced psychosis, when he had auditory hallucinations and felt suicidal. (Id.) He had no current hallucinations or suicidal ideation. (Id.) He was not taking any medication for fear of becoming addicted. (Id.)

His history of back problems began in 2000 and he has been unable to work since 2001. (Id. at 427.)

On examination, Plaintiff walked with a limp, winced in pain, and found it difficult to get comfortable during the evaluation. (Id.) One leg had a blood-stained bandage; Plaintiff thought a spider bite might have become infected and planned on going to an emergency room following the evaluation. (Id.) He was oriented to person, place, and time. (Id.) He was pleasant and cooperative and displayed a spontaneous, logical, and "adequately organized" stream of mental activity. (Id.) His affect was consistent with the information conveyed. (Id.) Although his speech was within normal limits, he had difficulty with word recall, consistent with people with extensive drug histories. (Id.) There were no indicators of psychosis or a major thought disorder. (Id.)

On testing, Plaintiff achieved a verbal IQ score of 64 on the WAIS-III; a performance IQ score of 75, and a full scale IQ score of 66. (Id. at 430.) With a five-point deviation, the "confidence interval" of the last score was 63-71. (Id. at 428.) This suggested "that he is likely to experience great difficulty keeping up with his peers in a wide variety of situations

that require age appropriate thinking and reasoning abilities." (Id.) His scores on the Working Memory Index ("WMI") suggested that "his ability to encode and manipulate verbally presented information and to perform mental arithmetical operations may be a relative weakness compared to his overall level of working memory abilities." (Id. at 429.) His ability to process visual material without making errors was less well developed than his peers. (Id.)

Dr. West diagnosed Plaintiff with borderline intellectual functioning and opined that he could not "readily secure gainful employment due to his limited intellect and lack of training." (Id. at 430.) He would also have "extreme difficulty acquiring a new trade"; his back injury apparently prevented him from maintaining employment in his current filed. (Id.) His GAF was 65.[7] (Id.)

Completing a MSS, Dr. West opined that Plaintiff had slight limitations in his ability to understand, remember, and carry out short, simple instructions and in his ability to carry out detailed instructions. (Id. at 431.) He was moderately limited in his ability to understand and remember detailed instructions and was markedly limited in his ability to make judgments on simple work-related decisions. (Id.) His abilities to respond appropriately to supervisors, co-workers, and work pressures in a work setting was not affected by his borderline intellectual functioning. (Id. at 432.)

---

[7]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic Manual at 34.

In June 2006, Plaintiff underwent another psychological evaluation by Dr. Mades. (Id. at 457-66.)  His chief complaints were hepatitis C, herniated nucleus pulposus, alcohol and polysubstance abuse, antisocial personality disorder, and borderline intellectual functioning.  (Id. at 457.)  At the examination, he complained of back, feet, and leg problems.  (Id.)  He had stopped drinking and using illegal drugs in 2000.  (Id. at 458.)  He had twice received inpatient treatment for detoxification.  (Id.)  He attended school through the third grade.  (Id.)  He was in juvenile detention and group homes but reported he did not receive any education during this period.  (Id.)  "When confronted with school records indicating attendance at least through 8th grade, he claimed that he did not know how that could be, that he was in [a group home]."  (Id.)  His inconsistency in how much education he received was noted by Dr. Mades.  (Id. at 459.)  His longest period of employment was one year.  (Id.)  He had multiple arrests as an adult for charges including fighting and stealing.  (Id.)  The longest he had spent in jail was 55 days.  (Id.)

On examination, his posture and gait were normal  (Id.)  His speech was normal in rate, rhythm, and content.  (Id.)  He had no thought disturbances, preoccupations, perceptual distortions, or delusions; he denied any hallucinations.  (Id. at 460.)  He was able to sit for over an hour without any "pain behaviors."  (Id. at 462.)  On testing, he had a verbal IQ score on the WAIS-III of 68, a performance score of 81, and a full scale score of 72.  (Id. at 461.)  The results were "considered to be a valid estimate of his current level of cognitive functioning."  (Id. at 460.)  "They may not, however, reflect his full potential given the decline in effort noted."  (Id.)  That decline was from a good effort to a "fair at best" effort.

(Id.)  He was in the borderline range of intellectual functioning.  (Id. at 461.)  He displayed strengths in the areas of attention to detail and assembling abstract designs and weakness in the areas of social judgment and common-sense thinking ability.  (Id.)  Dr. Mades noted that "[t]here was a significant difference between his verbal and performance scores, and it is felt that his performance score is the best indicator of his true cognitive potential."  (Id. at 462.)  The diagnosis was antisocial personality disorder and borderline intellectual functioning.  (Id. at 461.)  His GAF was again 75.  (Id. at 462.)

Completing a MSS, Dr. Mades opined that Plaintiff had slight limitations in his ability to understand, remember, and carry out detailed instructions and in his ability to carry out detailed instructions.  (Id. at 463.)  He was not otherwise limited by his borderline intellectual functioning, including in his abilities to respond appropriately to supervisors, co-workers, and work pressures in a work setting.  (Id. at 464.)

### The ALJ's Decision

The ALJ first found that Plaintiff had not engaged in substantial gainful activity after the filing of his current application for SSI on September 14, 2001.  (Id. at 378.)  He next found that the medical evidence established that Plaintiff had a herniated disc, hepatitis C, a history of polysubstance abuse in remission, an antisocial personality disorder, and borderline intellectual functioning, but did not have mental retardation or another impairment or combination thereof which was of listing-level severity.  (Id. at 378.)

After summarizing the procedural history of the case, the ALJ noted that the issue of physical disability "was covered at length in [Judge O'Blennis's] decision" and was not the

subject of the remand order.  (Id. at 375.)  That decision included the following findings about Plaintiff's residual functional capacity ("RFC"), findings which the ALJ adopted:

> The claimant has the maximum [RFC] to lift and carry no more than 10 pounds frequently and 20 pounds occasionally.  The claimant can sit, stand, or walk for up to six hours each in an eight-hour workday.  He can no more than occasionally kneel, crouch, and crawl.  He is limited to simple, routine, repetitive work.  He cannot perform work that requires close interaction with the public.  This [RFC] reflects an ability to  perform a range of light work.

(Id. at 21-22, 375.)  The medical records since these findings included treatment in July 2003 for back pain.  (Id. at 375.)  Plaintiff displayed at this visit "some limited range of motion and some sensation loss below his knees, but a neurological examination showed no clear sings of nerve root compression."  (Id.)  The ALJ noted that there was no evidence in the record that Plaintiff followed up on any of the treatment recommendations given at this visit.  (Id.)  Treatment received after this visit was not for back pain or radiculopathy.  (Id.)  The ALJ further noted that "[n]o doctor who has treated or examined the claimant since the date of Judge O'Blennis's decision has stated or implied that he is physically disabled or totally incapacitated, or that he has any new significant long-term exertional or other physical limitations or restrictions."  (Id.)

The ALJ then addressed the remand issues, "namely to determine if the claimant is really mentally retarded and really has valid IQ scores of 70 or below."  (Id. at 376.)  After summarizing, in detail, Dr. West's and Dr. Mades's evaluations in October 2005 and June 2006, respectively, the ALJ noted that Plaintiff's IQ scores when he was twelve years old were above that level and that subsequent, adult testing has been inconsistent.  (Id.)  He

opined that "[c]ommon sense dictates that one cannot manifest a higher degree of intelligence than what he possesses, although he can manifest a lower one." (Id.) Consequently, the ALJ found Plaintiff's highest IQ scores, the ones in June 2006, to be the most accurate. (Id.) The ALJ also noted Dr. Mades's observation that the IQ scores were valid, but thought that the remark might have been a "'canned' line that found its way into her report" based on her other remarks about inconsistent and poor to fair test efforts and about probable malingering in the January 2003 evaluation. (Id. at 377.) He found it significant that neither Dr. Mades nor Dr. West diagnosed Plaintiff with mental retardation despite his low IQ scores. (Id.)

The ALJ next addressed the issue of Plaintiff's work record. (Id.) Although his record might indicate low intellectual capacity and potential, his 2001 and 2001 earnings belied any such conclusion. (Id.)

The ALJ found that Plaintiff's allegations of impairments and their restrictions were not credible. (Id.) He further found that Plaintiff did not meet the criteria of Listing 12.05C for mental retardation and that his RFC as defined by Judge O'Blennis was still valid and relevant. (Id.) Plaintiff had only mild restrictions of mental activities of daily living and no more than moderate limitations in maintaining of social functioning. (Id.) He "is exertionally capable of *at least* light work." (Id.) Should, however, the case be remanded or Plaintiff file a new application, the ALJ's findings of a light work restriction and illiteracy – a claim not supported by any definitive evidence – would not "necessarily carry over to a new [RFC] determination." (Id.) Plaintiff did have a marginal or limited education. (Id. at 378.)

Consequently, although Plaintiff could not return to his past relevant work because of his exertional limitations, he could perform the full range of at least light work.  (Id.)  He was not, therefore, disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which

significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some medical evidence must be included in

the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski, 739 F.2d at 1322).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Also at step four, after an ALJ has assessed a claimant's RFC the ALJ will then "find that a claimant is not disabled if he retains the RFC to perform" the functional demands and job duties of his past relevant work as he actually performed them or as they are "generally required by employers throughout the national economy." **Wagner v. Astrue**, 499 F.3d 842, 853 (8th Cir. 2007). An "ALJ may elicit testimony from a [VE] in evaluating a claimant's capacity to perform past relevant work." **Id.**

The burden at step four remains with the claimant. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the claimant cannot perform his past relevant work, the Commissioner must determine at step five whether the claimant can perform any other kind of work. **Hepp v. Astrue**, 511 F.3d 798, 803 n.4 (8th Cir. 2008). The burden shifts to the Commissioner at this step. **Steed**, 524 F.3d at 875 n.3.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (internal quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account

whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000).

### Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, the ALJ erred (1) in finding that he did not meet Listing 12.05(C) because he meets the requirements of the Listing in that his valid IQ scores consistently satisfy the first part and his additional mental and physical impairments satisfy the second part and (2) in failing on remand to consult a mental health expert about whether Plaintiff satisfied the criteria of Listing 12.05(C).  The Commissioner disagrees.

Listing 12.05 is "Mental Retardation and Autism."  20 C.F.R. Pt. 220, Appx. 1. "Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)."  Id.  This manifestation requirement is mandatory.  **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006).  To satisfy the Listing, the requirements in A, B, C, or D, below, must be satisfied.  20 C.F.R. Pt. 220, Appx. 1.  The requirements of (C) are "[a] valid verbal,

performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 220, Appx. 1, § 12.05(C). "In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided as on the WAIS, the lowest of these is used in conjunction with listing 12.05." 20 C.F.R. Pt. 220, Appx. 1, § 12.00(D). "[T]he regulations do not address[, however,] which IQ score is the appropriate when multiple tests have been given," **Miles v. Barnhart**, 374 F.3d 694, 700 (8th Cir. 2004); accord **Muncy v. Apfel**, 247 F.3d 728, 734 (8th Cir. 2001), as in the instant case.

To satisfy Listing 12.05(C), a formal diagnosis of mental retardation is not required. **Christner v. Astrue**, 498 F.3d 790, 793 (8th Cir. 2007); **Maresh**, 438 F.3d at 899. This is so because the "medical standard for mental retardation differs from the legal standard." **Scott ex. rel. Scott v. Astrue**, 529 F.3d 818, 824 n.4 (8th Cir. 2008).

As noted above, the first criteria is "[a] valid verbal, performance, or full scale IQ of 60 to 69 inclusive." 20 C.F.R. Pt. 220, Appx. 1, § 12.05(C). Plaintiff was given the WAIS-III once in 2003, once in 2005, and once in 2006. His scores in 2003 were a full scale score of 67, a performance score of 73, and a verbal score of 67. In 2005, his scores were a full scale score of 66, a performance score of 75, and a verbal score of 64. In 2006, his scores were a full scale score of 72, a performance score of 81, and a verbal score of 68. Thus, his performance scores were consistently above the range for mental retardation; his verbal scores were consistently below. Generally, his lowest scores would be used; these would

satisfy the first prong of Listing 12.05(C). A low IQ score, in and of itself, is not substantial evidence of mental retardation. An "IQ score[] must be valid, . . . the Commissioner need not rely exclusively on IQ scores, and . . . the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole." **Clay v. Barnhart**, 417 F.3d 922, 929 (8th Cir. 2005). The ALJ determined that Plaintiff's low IQ scores were not valid, reasoning that it was a matter of common sense that an individual could exhibit a lower degree of intelligence than possessed but not a higher one. This reasoning is inconsistent with the Commissioner's regulations requiring that the lowest IQ score is to be used when a test provides more than one. Even if the latest WAIS-III scores are used, the lowest of those scores fall within the range of the first prong. Additionally, the ALJ considered Dr. Mades's remark about both sets of IQ scores being valid as a "canned line." Each report also included a line about the scores not reflecting claimant's full potential. The ALJ does not address the issue of why her first repeated remark is "canned" but not the second. The ALJ also noted that Plaintiff's IQ scores when he was twelve were above the level of mental retardation. There is no indication or explanation in the record of what test was used. See **Miles**, 374 F.3d at 700 (affirming ALJ's decision rejecting claimant's school IQ scores where the school records failed to described the type of IQ test administered and did not include any narrative explaining the scores). Also, on remand the ALJ was to elicit evidence from a mental health medical expert specifically about whether Plaintiff satisfied the criteria for mental retardation. Although, as noted above, the legal standards for mental retardation are different than the legal, if

asked, a mental health medical expert might have addressed the significance of Plaintiff's early IQ scores. The Diagnostic Manual notes that individuals who are mildly mentally retarded, individuals with an IQ level from 50-55 to approximately 70, are often not distinguishable from children who are not mentally retarded until a later age. Diagnostic Manual at 41, 46. Moreover, the regulations provide that IQ scores 40 and above that are obtained between ages seven and sixteen are current for only two years. **Scott ex. rel. Scott**, 529 F.3d at 824.

The ALJ need not have relied on Plaintiff's low IQ scores if the scores were inconsistent with his abilities and activities as reflected on the record as a whole. Noting that his lack of employment might be consistent with mental retardation, the ALJ concluded that Plaintiff's brief period of productive employment negated that support. This is insufficient given Plaintiff's other abilities and activities. For instance, the record is silent as to any social relations other than his brother and step-daughter[8] assistance.[9] See **Chunn v. Barnhart**, 397 F.3d 667, 672 (8th Cir. 2005) (claimant's past work at factory would not alone undercut psychologist's opinion that claimant was mildly retarded; claimant had no friends, was separated from husband and did not know why, and cared for two children). See also **Maresh**, 438 F.3d at 901 (rejecting Commissioner's argument that claimant's mental retardation did not preclude him from working as evidenced by his employment for one and

[8]The record reflects that Plaintiff was never married; the existence of a step-daughter is unexplained.

[9]In documents completed when he was applying for SSI, Plaintiff said he received financial help from his girlfriend. She is not mentioned in his hearing testimony.

one-half years). Between his first earnings in 1975 and when he went to work for the tannery in 1999, he had only one year in the intervening twenty-four years that he earned more than $5,000 annually. He has lived since he was fourteen in an apartment owned by his mother. He is not able to read and write. In the case of **Cox v. Astrue**, 495 F.3d 614 (8th Cir. 2007), the Eighth Circuit Court of Appeals concluded that the ALJ had not failed to carry his burden of developing the record when it included seemingly contradictory language of a psychologist about whether the claimant was mentally retarded. **Id.** at 618. The claimant's IQ scores were in the mid- to upper-sixties. **Id.** at 616. Noting that these scores placed the claimant in the "'mild' retardation range," the psychologist further reported that the claimant's "[a]daptive behavior appeared more consistent with 'borderline' intellectual functioning." **Id.** The court concluded that the psychologist had not meant to diagnose the claimant with mental retardation because she had also reported[10] that the claimant had, inter alia, "generally successful social relations," "ha[d] exhibited self-sufficient behavior," and had no limitations in her concentration, persistence, or pace. **Id.** at 618. These factors were more consistent with borderline intellectual functioning. **Id.** "To hold otherwise would require the improbable conclusion that [the psychologist] had intended to offer a cursory diagnosis in direct contradiction to the careful findings and conclusions she thoroughly recounted and characterized on prior pages . . . " **Id.** There are no such contradictory activities or abilities in the instant case. Cf. **Clay v. Barnhart**, 417 F.3d 922,

---

[10]The Court described the discussion in the report as "direct, precise, and extensive." **Id.**

929-30 (8th Cir. 2005) (affirming ALJ's decision to disregard findings of examiner; although examiner had characterized low IQ scores as valid, examiner had also found that claimant failed to make serious effort in testing, exaggerated physical complaints, and was possibly malingering; examiner's findings of low IQ scores were also *inconsistent with other examiners' conclusions about claimant's IQ and ability to function*).

It is not enough that Plaintiff has a low IQ; his deficits in adaptive behavior must have initially manifested themselves before he was 22 years old. There is support in the record for a finding that they did. Plaintiff testified that he was in and out of trouble when he was young. He left school after the eighth grade. In **Maresh**, the Eighth Circuit Court of Appeals found that the claimant had exhibited deficits in adaptive functioning at a young age when he had frequent fights with other children, had dropped out of school after the ninth grade, and could not read or write. 438 F.3d at 900. The court concluded that "the ALJ should have found that [the claimant's] impairment manifested itself during his developmental period." **Id.** See also **Christner**, 498 F.3d at 793 (finding that remand was appropriate for reconsideration of plaintiff's IQ score when plaintiff dropped out of school in sixth or eighth grade, attended special education classes, did not live independently, and was unable to read or write).

For the foregoing reasons, the ALJ 's decision that Plaintiff's valid IQ scores did not place him in the range of Listing 12.05(C) is not supported by substantial evidence on the record as a whole. Therefore, the case must be remanded for evidence, as directed by the earlier remand order, on whether Plaintiff has a valid IQ score that places him in the first

prong of Listing 12.05(C).[11]  This does not necessarily necessitate the administration of another WAIS-III test.  It does, however, at a minimum require clarification by Dr. Mades of her inconsistent conclusions about whether his low IQ scores are valid and a consideration of the other evidence, including his ability to read and write, live independently, and sustain social relationships, that support or detract from a finding of mental retardation.  See **Muncy**, 247 F.3d at 734 (remanding case to ALJ to resolve discrepancy in IQ scores unexplained by any evidence of "dramatic upswing" in claimant's intellectual or adaptive functioning and noting that claimant remained unable to read, write, manage finances, or fill out Social Security applications).

Plaintiff argues that the case should not be remanded; he should immediately be awarded benefits.

"Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and [the court] find[s] such a denial was improper, [the court], out of [its] abundant deference to the ALJ, remand[s] the case for further administrative proceedings."  **Buckner v. Apfel**, 213 F.3d 1006, 1011 (8th Cir. 2000) (internal quotations omitted).  To do otherwise, the record must "overwhelmingly support[]" such an immediate finding of disability."  **Id.** (internal quotations omitted).  The record in the instant case does not satisfy this criterion.  Dr. Mades did question in 2003 whether Plaintiff was malingering and questioned his effort

---

[11]The Court notes that the ALJ's findings of severe impairments, including an antisocial personality disorder, would arguably satisfy the second prong of Listing 12.05(C).  See **Maresh**, 438 F.3d at 900 (finding that personality disorder, characterized by ALJ as a severe impairment, was additional, significant impairment required by Listing 12.05(C)).

in 2006. His lack of relationships and the absence of independent living might be attributable to his history of drug and alcohol abuse, not to his level of intellectual functioning. It is not that there is substantial evidence on the record as a whole to support a finding of disability; it is that there is not substantial evidence on the record as a whole to support the ALJ's adverse finding. See **Id.** (rejecting argument that immediate finding of disability, not remand, was warranted on grounds that record supported a conclusion that claimant's impairments met Listing 12.05C).

Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  5th  day of September, 2008.